FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★   OCT 0 7 2016   ★

LONG ISLAND OFFICE

**EASTERN DISRTICT OF NEW YORK**
-------------------------------------X
**DARIUS MCCOLLUM**

                  Plaintiff,        **AMENDED COMPLAINT**

        -against-          16-CV-5272 (JFB)(ARL)

**CITY OF NEW YORK, New York City**
**Department of Correction, New York City**
**Police Department, and The Honorable Betty**
**Williams**

                Defendants
-------------------------------------X

---

    COMPLAINT FOR 42 USCA § 1983, MONELL CLAIM: 42 U.S.C.A. § 12131, ET SEQ., TITLE II OF THE AMERICANS WITH DISABILITIES ACT OF 1990; §504 OF THE REHABILITATION ACT OF 1973; AND N.Y.C.H.R. LAW § 8-107, ET SEQ.

---

### Introduction

This is a case about he continued discrimination by the City of New York towards its citizens with mental disabilities, who commit non-violent crimes due solely to their illness, and instead of getting proper treatment by their federally funded programs available to other citizens who's mental illness doesn't cause then to commit non-violent crimes, the plaintiff and people similarly situated, are instead thrown in prison.

    This plaintiff DARIUS MC COLLUM, a/k/a "the boy who loved transit", suffers from Asperger's Syndrome, a form of Autism where the sufferer of this severe mental illness has an extreme obsession with a particular object. In the plaintiff's case, his Moby Dick, are trains and buses.[1] Plaintiff's extreme obsession is well known to the City of New York, the MTA, both Transit and City Police, and Investigator James J. Maxwell, from the New York State Police who is assigned to the FBI Joint Terrorist Task Force in New

---

[1] See EXHIBIT A "The Boy who loved transit."

RECEIVED

OCT 1 1 2016

EDNY PRO SE OFFICE

York City;[2] and soon around the country as a motion picture will be released in Fall of 2016, about the life of the plaintiff and his serious obsessive compulsive mental illness, starring Julia Roberts as plaintiff's lawyer. The City, and its law enforcement communities exploited the plaintiff, using him for his knowledge of the transit system and has been able to use this information to provide a more secure transit system for society today.

In spite of his recognition throughout the City of New York, and his well-known mental health problems, he was thrown in to prison to serve a lengthy sentence rather than receive treatment for his condition.

The plaintiff is now back in custody at Riker's Island, charged with pilfering a bus with no passengers. The City, instead of having him placed into a mental health residential program (intensive treatment), to address his Asperger's with medication, once again has him facing a lengthy prison term of 5-10 years in Brooklyn Supreme Court. This is a case of lack of human decency, humanity, and society's advanced views on how it should take care of its mentally ill citizens. Instead of institutionalizing them and denying them the same community residential mental health treatment that is afforded to everyone else, with mental disabilities.

## Parties

1.)     Plaintiff Darius McCollum, currently resides at Riker's Island, 18-18 Hazen Street, East Elmhurst, NY 11370.

2.)     Defendants City of New York and    are a municipality and are being sued under MONELL claims, for the customs,  policies, rules, regulations, directives, usage, written and unwritten policies,

---

[2] See EXHIBIT B letter from Inv. James J. Maxwell

2

promulgated by the City through its local law enforcement machinery, and is located at: Law Department, 100 Church Street, New York, N.Y. 10007.

## Jurisdiction

3.)   This Court has jurisdiction over all claims under 42 U.S.C.A. §1983, MONELL claims, 42 U.S.C.A §12131, et seq, Title II of the Americans with Disabilities Act of 1990, and §504 of the Rehabilitation Act of 1973, as well as plaintiff's pending State law claims which are so closely related to the Federal claims as to form part of the same case of controversy within the meaning of Article III of the U.S. Constitution, 28 USCA § 1367, so that this Court may exercise supplemental jurisdiction over those non-federal claims under said Title, supra.

## Jury Trial

4.)   Plaintiff demands a jury trial on all issues and claims, as to each separate cause(s) of action.

## Grievances

5.)   The causes of action are non-grievable

## Statement of Facts

6.)     On November 11, 2015 at or about 4:00 PM, was arrested by the
NYPD on Third Avenue and Union Street, in the Park Slope section of
Brooklyn, County of Kings.

7.)     Plaintiff was placed in handcuffs and shortly after an unmarked
anti-crime unit, arrived on the scene and began asking questions, at
which time the plaintiff was recognized as DARIUS Mc COLLUM.

8.)     The anti-crime officer told the uniformed officer that plaintiff
was "mental and has a long history of doing this."

9.)     Plaintiff was taken to the 78th precinct and field detectives
interviewed the Plaintiff. The detectives knew the plaintiff suffered
from a mental health problem as they asked him what his specific mental
disability was.

10.)    Plaintiff told Sgt. Luidely Baez that he has "Asperger's
Syndrome, with Extreme Compulsive Obsession.[3]"

11.)    Plaintiff was taken to central booking after being interrogated
by police without Miranda warnings or signed waivers.

12.)    During his stay and process through central booking Plaintiff had
a mental relapse and was taken to the hospital for anxiety attacks.

13.)    Plaintiff was arraigned in Brooklyn Criminal Court and instead of
being sent to either Mental Health Court, or to a Mental Health
facility he was given bail of $100,000.00 and sent to Riker's island.

14.)    Plaintiff has since been offered a plea deal of five to ten years
in prison.

15.)    Instead of treating the plaintiff's condition, he is being
punished for his criminal conduct (which is a direct result of his
mental disability) by the City of New York and its policies.

---

[3] See Plaintiff's NYC Health Hospital, mental diagnosis sheet. EXHIBIT C

4

## First Separate Cause of Action 42 USCA §1983 Monell Claim

16.)     Plaintiff repeats his claims contained in paragraphs 1-15 as stated herein.

17.)     The Defendant's (the City of New York) has established policies of prosecuting and sentencing persons with serious mental health disabilities to long prison terms for non- violent crimes, rather than placing them (through Mental Health Court) into the many Federally funded inpatient facilities available.

18.)     The City has failed to properly train its police officers to recognize persons with mental health problems. In lieu of arrest these people should be detained for 120 hours in a secure Mental Health facility for evaluation and treatment.

19.)     The City's current policies discriminate against the mentally ill by depriving them access to proper treatment. Sending the mentally ill defendant to Riker's island without access to treatment is a violation of the Plaintiff's Constitutional rights under the 8th and 14th Amendments.

20.)     These actions violate The City of New York's own Human Rights Law §8-502 (a).

21.)     The City's indifference, and deliberate failure to address Plaintiff's mental health needs, have caused him harm.

22.)     The Plaintiff is also suing to enforce his statutory rights under the ADA.

23.)     Plaintiff is also suffers from hearing loss and is in need of hearing aids.

5

times herein mentioned, Plaintiff has been a qualified individual with a disability and was denied a wide range of public services and civil rights.

25.)     Plaintiff has been unable to participate in his legal proceeding thus far because he has not been provided with hearing aids.

26.)     Plaintiff's attorney has repeatedly stated in Court that the plaintiff cannot understand or participate in the Court proceedings (much less assist in his own defense) because he cannot hear and has not been given hearing aids.

27.)     At all times herein mentioned the City of New York has been subject to follow the ADA.

28.)     At all times herein mentioned the Plaintiff was denied the opportunity to benefit from Mental Health services and denied the right to actively participate in his legal proceedings.

29.)     The defendants knew or should have known the ADA law requires public entities to make reasonable modifications in policies, practices and procedures to avoid discrimination on the basis of disability.

30.)     Defendants violated the Plaintiff's constitutional rights by questioning him without his attorney notified or present.

31.)     Defendants took advantage of Plaintiff's mental disability by interrogating him, without his attorney present, in violation of his Miranda rights.

32.)     Other groups in the same situation but without mental disabilities would have been afforded Miranda protection.


WHEREFORE, Plaintiff Darius Mc Collum, is suing Defendants for past present and future pain and suffering, punitive damages, attorney fees, injunctive relief, violation of his 5th, 8th and 14th Amendment rights in the

6

amount of FIVE MILLION DOLLARS ($5,000,000.00) and whatever relief the Court

deems just and proper.


### AS FOR A SECOND SEPARATE CAUSE OF ACTION TITLE II OF THE AMERICANS WITH DISABILITIES ACT OF 1973 42 U.S.C.A. §12131, ETC.

33.)     Plaintiff repeats the averments contained in paragraph (s) 1-31, as if fully stated herein.

34.)     Plaintiff reiterates, that at all times when his protected rights were violated, plaintiff was the following:

   a.    qualified individual with a disability;

   b.    the City defendants are subject to the ADA.

   c.    denied the opportunity to participate in or benefit from the defendants services, programs or activities; and

   d.    discriminated against by the defendants by reasons of his known disability.

WHEREFORE, plaintiff Darius McCollum, is suing the City for violating

his Civil Rights under Title II of the Americans with Disabilities Act (42

U.S.C.A. §12131, etc), for past, present and future pain and suffering, said

segregation of persons with disabilities through the act of incarceration as

a form of discrimination, attorney fees, injunctive relief, in the amount of

FIVE MILLION DOLLARS ($5,000,000.00), and whatever relief this Court deems

just and proper.


### AS FOR A THIRD SEPARATE CAUSE OF ACTION SECTION 504 OF THE REHABILITATION ACT 29 U.S.C.A. § 794 (a)

35.)     Plaintiff repeats the claims contained in paragraph (s) 1-33 [a-d], as if fully stated herein.

36.)     City defendant receives federal funding for its mental health programs, throughout the City of New York. These federally funded programs were denied to this plaintiff, in spite of his mental disability.

WHEREFORE, plaintiff Darius McCollum, is suing the City defendant for

7

violation of federal law Supra, in the amount of FIVE MILLION DOLLARS (5,000,000.00), in addition to pain and suffering, segregation of persons with mental disabilities, punitive damages, attorney fees, injunctive relief and whatever relief this Court deems just and proper.

### AS FOR A FOURTH SEPARATE FINAL CAUSE OF ACTION NEW YORK CITY HUMAN RIGHTS LAW §8-107§5) (a)

37.)    Plaintiff repeats the claims contained in paragraph(s) 1-36, and sub parts, as if fully stated herein.

38.)    The defendants' policies or lack thereof, discriminate against individuals with mental health disabilities.

39.)    Instead of deferring said individuals charged with non-violent crimes associated with their mental illness and/or disabilities to a mental health facility for evaluation, they are thrown in a detention setting, thus being denied the necessary full services an outside mental health facility can provide.

40.)    That full complete around the clock services, are not offered nor are any suitable accommodations made in the detention setting, to allow proper treatment.

41.)    In a detention setting, services such as all day therapy classes, one on one psychologist, daily meetings for progress, weekly psychiatrist interviews, and group meetings, are not provided.

42.)    City defendants policies, etc. or inactions, discriminates against the plaintiff in its detention/jails.

43.)    The City defendant's policies, being followed by its employees, servants, knew or should have known that plaintiff had a qualifying disability.

Said City defendants violated §8-107(5)(a), (2), to wit;

> "It is illegal to discriminate against
> any person because of such person's

8

actual or perceived disability"

WHEREFORE, plaintiff Darius McCollum, is suing defendant

City of New York in the amount of FIVE MILLION DOLLARS ($5,000,000.00),

for punitive damages, mental anguish, discrimination, emotional trauma,

violation of plaintiffs said Civil Rights under the 5th, 8th, and 14th

Amendments, attorney's fees, injunctive relief, and whatever relief

this Court deems just and proper. 28 U.S.C.A. §1746


I, DARIUS McCOLLUM, declare under the penalty of perjury, that the
aboveis true and correct to the best of my knowledge based on
information and belief.

Dated:      October 6, 2016
New York, New York


DARIUS McCOLLUM
#141-15-10921
Rikers Island
18-18 Hazen Street
East Elmhurst, New York 11370

9

EXHIBIT "A"

The Boy Who Loved Transit : Longreads Blog                                                                                                    12/19/15, 1:59

Our Picks Exclusives Blog
Longreads

# The Boy Who Loved Transit

*How the system failed an obsession.*



*Photo via mtaphotos (Edited)*

*Jeff Tietz | Harper's | May 2002 | 35 minutes (8,722 words)*

*This essay by Jeff Tietz first appeared in the May 2002 issue of Harper's and was later
anthologized in The Best American Crime Writing: 2003 Edition. Tietz has written for
Rolling Stone, Harper's, The New Yorker, The Atlantic and Vanity Fair. He has been a
finalist for the National Magazine Award, the Pushcart Prize, and the Livingston
Journalism Award. His work has appeared in Best American Magazine Writing, Best
American Crime Writing, Best American Business Writing, and The CAFO Reader. Our
thanks to Tietz for allowing us to reprint it here. For those interested in an update on
Darius McCollum's story, see this 2013 The Wall Street Journal piece (subscription req'd).*

\*\*\*

Before leaving his girlfriend's apartment in Crown Heights, on the morning of his
nineteenth arrest for impersonating and performing the functions of New York

Case 2:16-cv-05272-LDH-VMS   Document 6   Filed 10/07/16   Page 12 of 36 PageID #: 60
The Boy Who Loved Transit : Longreads Blog
Case 2:16-cv-05272-JFB-ARL   Document 1   Filed 09/15/16   Page 16 of 40 PageID #: 16   12/19/15, 1:59

City Transit Authority employees, Darius McCollum put on an NYCTA subway conductor's uniform and reflector vest. Over his feet he pulled transit-issue boots with lace guards and soles designed to withstand third-rail jolts. He took transit-issue work gloves and protective goggles. He put a transit-issue hard hat on his head. In his pockets he carried NYCTA work orders and rerouting schedules and newspaper clippings describing his previous arrests: for driving subway trains and buses and various other vehicles without authorization, possessing stolen property, flagging traffic around NYCTA construction sites, forging documents. He also carried a signed letter on NYCTA letterhead:

*To: All Concerned Departments*

*From: Thomas Calandrella Chief Track Officer*

*Re: Darius McCollum Effective this date of January 10, 2000, Darius McCollum is a member of a special twelve member Special Study Group; and will analyze the operations of track safety and track operations. SSG will report directly to this office and will be issued all related gear for the respected purposes of this department and will receive assistance of any relating department.*

To his belt Darius clipped a flashlight and a key ring the size of a choker. From this ring six smaller rings hung like pendants. Along the curves of the small rings, 139 keys climbed symmetrical and fanlike. Each key granted access to a secure area of the train, bus, or subway system of the New York City Transit Authority. The collection was equivalent to the number of keys an employee would acquire through forty years of steady promotions. Just before he left the apartment, Darius picked up an orange emergency-response lantern.

Six weeks earlier, Darius had been paroled from the Elmira Correctional Facility, near Binghamton, New York, where he had served two years for attempted grand larceny—"attempted" because he had signed out NYCTA vehicles for surface use (extinguishing track fires, supervising maintenance projects) and then signed them back in according to procedure. Darius has never worked for the NYCTA; he has never held a steady job. He is thirty-seven and has spent a third of his adult life in prison for victim-less offenses related to transit systems.

He was at work by 7:20, eating buttered rolls and drinking coffee in a GMC pickup with a small signal crew above the Nostrand Avenue stop on the Number 3 line. The truck was hitched to an emergency generator temporarily powering the station lights; during a repair job Con Edison had spliced into the wrong cable.

Case 2:16-cv-05272-LDH-VMS   Document 6   Filed 10/07/16   Page 13 of 36 PageID #: 61

The Boy Who Loved Transit : Longreads Blog                                                     12/18/15, 1:50

Traveling through the system three days earlier, Darius had encountered the crew members and told them that he was a track-department employee waiting for his truck to be fixed. In the meantime, he said, his only responsibility was the occasional street-flagging operation. The signal guys were on what they, and therefore Darius, called "a tit job": babysitting the generator and periodically reporting on the electrical work. Darius sat in the station with the signal guys, surveying the Con Ed work and watching girls.

That slow morning there was a lot of conversation about the transit union. Its president, Willie James, was on his way out. Darius, who is voluble and almost perpetually affable, was deferentially critical of James, who, he said, "came from buses and favored the bus guys." Darius voiced or echoed complaints about the effects of union inaction: low pay, retirement after twenty-five years instead of twenty, the difficulty of getting basic equipment. For nearly two decades Darius had attended NYCTA workers' rallies and union meetings. At the meetings he had argued for, among other things, better lighting in tunnels and the right to wear earplugs against ambient noise. He had agreed that positive drug tests should result in mandatory ninety-day suspensions and counseling but objected to withholding salary during that time. He took detailed notes as he traveled through the system so that he could accurately critique management actions.

## He is thirty-seven and has spent a third of his adult life in prison for victim-less offenses related to transit systems.

At noon Darius volunteered to go to his girlfriend's apartment and bring back lunch for the crew. Darius had met his girlfriend a week earlier, on the subway. It was a snowy night; they were alone in the car. Darius said she looked cold. She nodded and smiled and pointed to his uniform. He told her where he worked in the track department and how he approached various kinds of emergency situations and that he did street flagging and drove heavy equipment. She didn't understand anything he said because she was from Ecuador and didn't speak English. Her name was Nelly Rodriguez. She was forty-five and had five children and worked as a seamstress in a garment factory. They exchanged phone numbers; later her sister translated for them.

Within a week Nelly had asked Darius for his Social Security number and invited him to move in. Several months later they would be married, and Darius would confess to Nelly, having fabricated a story about his nineteenth arrest, that he was a lifelong subway impostor, and she would say, through her sister, "If it's your

problem it's our problem, and I'm not going to tell anybody," and then successfully inveigle him into signing over the rights to his story to a small Manhattan production company for a relatively tiny sum (several newspapers had covered his arrest). Eventually a lawyer hired by Darius's parents would void this agreement, and Darius would yield to their unremitting pressure and request a divorce. When he is asked now if he worried about his quick start with Nelly, Darius says, "No, because I had already said a long time ago that I had not planned to get married until I was at least in my thirties... I wanted to get married when I was a little more settled, when I had a little better insight."

In Nelly's kitchen, Darius ate a plate of the fish and rice and beans that she had cooked the night before. He sealed the rest in Tupperware and brought it back to the crew. He told the guys to take their time finishing up; he had to check on his truck at fleet operations. Then he left to visit a friend, a token-booth clerk at Fifty-seventh Street in Manhattan.

Darius's friend was at lunch when he arrived, so he let himself into the station's command tower to wait. The control room had a big signal board that tracked train movement and a tinted picture window with a platform view. The vacant tower had recently been automated, but Darius remembered when the seven empty lockers had been full and when, in the recessed kitchen with its miniature sink and stove, there had been pots in the bottom cabinet and food in the top. He had often stopped by to chat about work, or read the newspaper, or get a doughnut and a cup of coffee.

Darius sat surveilling the lights on the board: a clear-skinned dark black guy of average height in an unusually complete Transit Authority uniform. Darius is only slightly overweight, but everything about him appears tender and fleshy: the heels of his hands and the little underhung bellies of skin between the knuckles of his fingers, his small paunch, the cushions of his cheeks, his chubby iridescent lips. His movements are almost always leisurely—when he's being chased by transit cops he lopes onerously, counting on his knowledge of the system's crannies—and he stands slightly stooped, the shallow curve of his back in conformity with all the small padded curves of his body. Darius has big circular eyes that quickly admit delight, a serene form of which he was feeling as he absorbed the scrupulous, luridly represented shuttling of the trains. He can't explain why, but he is always content in the subway: elementally content, at unrivaled ease, unable to think about anything outside the system.

***

Case 2:16-cv-05272-LDH-VMS   Document 6   Filed 10/07/16   Page 15 of 36 PageID #: 63
The Boy Who Loved Transit : Longreads Blog
Case 2:16-cv-05272-JFB-ARL   Document 1   Filed 09/15/16   Page 19 of 40 PageID #: 19      12/18/15, 1:54

Darius grew up near the 179th Street yard, the terminus of the F train, in Jamaica, Queens. He was a bright, early-talking child. His obsession with the subway manifested itself as soon as he began riding trains with his mother, at age three: his desire to see a train's headlights materialize in the tunnel black always threatened to propel him over the platform edge. The force of this attraction never diminished. Darius did well in school, but an opaque inwardness isolated him from other children and worried his teachers; he never formed enduring friendships or felt comfortable in class.

Darius spent hundreds of hours watching trains at 179th Street. He estimated the angle of every track intersection in the yard. By the time he was eight, he could visualize the entire New York City subway system. (Later he memorized the architecture of the stations.) Family and friends with subway questions began calling the McCollum household and asking for Darius. In small notebooks he recorded arrival and departure times at various stations, and documented whatever he observed: the shrill, keyed-up atmosphere an emergency stop instantly creates on a platform, the presence of transit police, mechanical problems ("E-train to Canal st 0015 L.C. Delay of train leaving Parson's Blvd Door Trouble"), passengers riding between cars ("A-train to 81st L.C. 4112—Girl riding in between cars approx. 17 Brown Coat Blue Pants Brown Shoes"). He hasn't abandoned this note-taking. His logs—

    *0210 D train 169st N.P.C. Meal*

    *0217 S/B F 169th st L.C. 586*

    *0230 S/B F Woodhaven D train*

    *0311 N/B F 71st F.H. L.C. 1200*

    *0317 N/B E Kew Gardens L.C. 1134 ...*

—span twenty-five years.

When Darius was eleven, a classmate, unprovoked, stabbed him in the back with a pair of scissors. The scissors punctured a lung and came within an inch of his heart. The boy opened and closed the scissors as he pulled them out, creating a wound in the shape of an irregular star. At the hospital, doctors pumped blood out of Darius's lung and re-inflated it. He didn't speak that day or the next: he just stared at his parents with awestruck eyes. At night he paced in his sleep or lay awake. When he went back to school, he would sit only with his back against the wall.

http://blog.longreads.com/2015/06/05/the-boy-who-loved-transit/

Case 2:16-cv-05272-LDH-VMS   Document 6   Filed 10/07/16   Page 16 of 36 PageID #: 64
The Boy Who Loved Transit : Longreads Blog
Case 2:16-cv-05272-JFB-ARL   Document 1   Filed 09/15/16   Page 20 of 40 PageID #: 20   12/18/15, 1:5...

Not long after the stabbing, Darius began disappearing into the subway system for days at a time:

> *3/30/81 7:30 didn't go to school, but then I went on the J train up to Chambers st* *_11:30 I went back on the J train and went to catch the D train to Brighton Beach at approx 12:45. Transf to M train and went to Stillwell a 1:05 and went to the bathroom (no food dur this time) back on the M, return to Brighton and took D train to pacific st (Bklyn) approx 2:00 took the #2 train transfered to the #6 to 28th street to Girls Club at 3:30 pat, angie, rosemary. They gave me a sandwich and milk and then left 3:45....*

> *4/2/81 I lef5 to #6 to Grand Central took # 7 to 5th ave and took F for the rest night, and slept on the F train Balance of night till approx 6:30 am.*

Darius counted on certain relatives in Queens and Brooklyn: he would stop by to eat and spend the night and then return to the subway. He often went home for provisions when his parents were asleep or at work. Samuel and Elizabeth McCollum worked long hours, but they tried to stay up later than their son and wake up before him. They tried to lock him in and lock him out; they talked to NYCTA supervisors; they called his school and arranged for morning escorts; they tried different schools; they had him hospitalized for psychiatric treatment. But each remedy had its limit, and ultimately they found that they could only interrupt his journeying. Mrs. McCollum tracked her son's movements. On one of her calendars, the word "out," meaning "location unknown," fills fourteen day-boxes in January of 1981, when Darius was first arrested for driving a train. The four days from the twenty-seventh to the thirtieth read: *late for school--in at 10:00 a.m.; home; out--drove train; court.*

### *It is difficult to find anyone who knows Darius well and does not express an abiding protective affection for him.*

By this time Darius had cultivated a constellation of admirers at the 179th Street yard. Darius has always been deeply disarming. His charm resides in his peculiar intelligence, his perpetual receptivity to transporting delight, and his strange, self-endangering indifference to the consequences of his enthusiasm. Darius never curses. He has no regionally or culturally recognizable accent. He has a quick-to-appear, caricaturishly resonant laugh, like the laugh ascribed to Santa Claus, and he can appreciate certain comedic aspects of what he does, but he often laughs too long or when things aren't funny, as when he mentions that he briefly worked on

The Boy Who Loved Transit | Longreads Blog
Case 2:16-cv-05272-LDH-VMS   Document 6   Filed 10/07/16   Page 17 of 36 PageID #: 65
Case 2:16-cv-05272-JFB-ARL   Document 1   Filed 09/15/16   Page 21 of 40 PageID #: 21   12/18/15. 1:59

the LIRR route that Colin Ferguson took to slaughter commuters. Darius litters his speech with specialized vocabulary ("BIE incident," "transverse-cab R-110") and unusually formal phrases ("what this particular procedure entails," "the teacher didn't directly have any set curriculum studies"). He frequently and ingenuously uses the words "gee," "heck," "dog-gone," "gosh," and "dang."

It is difficult to find anyone who knows Darius well and does not express an abiding protective affection for him. Cops always refer to him by his first name, and often with wistful amusement, as if he were a wayward godson. In discussing his cases, they have called him "great," "endearing," and "fabulous." They mention his honesty and abnormally good memory. Sergeant Jack Cassidy, a high-ranking transit cop who has interviewed Darius more often than anyone else in the NYPD, told me, "You'll be talking to a fantastic person when you talk to Darius, and I hope prison never changes that. Give him my best. But don't tell him where I am, because he'll probably come visit me." (Darius has paid Sergeant Cassidy several friendly, unannounced visits at his office, in full transit gear.)

*\*\**

Darius's apprenticeship began with a motorman he called Uncle Craft, who drove the first train Darius took regularly. When Craft began working at the 179th Street yard, he taught Darius to drive along the generous stretch of track between the yard and the last F stop. Darius learned how to ease a train into a station, aligning it with the markers that match its length, how to read signals while simultaneously observing the track connections the signals predict (he was taught never to assume the infallibility of signals), and how to understand the timers that govern the signals. Darius was an exceptional, methodical student: he learned quickly and thoroughly, building on each skill he acquired and instantly memorizing terminology. Soon he was doing yard maneuvers and taking trains into passenger service, as both a train operator and a conductor. (By the time of his first arrest, he had driven trains dozens of times.)

## Eventually Darius began taking the skills tests the NYCTA requires for employment, but by then he was notorious.

To broaden his knowledge, Darius visited employees from 179th Street who had taken up new positions elsewhere. He learned to drive garbage trains and de-icer trains and to repair the electrical boxes that control signals. In renovation shops he learned how to dismantle trains and reassemble them. In control towers he learned how to direct traffic: routing trains around obstructions, replacing late trains,

switching ABD trains ("abandoned due to malfunction") out of service. The more he learned the more he volunteered to do, and the easier he made the lives of the people who taught him. By the time he was eighteen, TA employees had begun calling him at home and asking him to pull shifts.

Darius was given his first uniform at fifteen: "I can't compare that feeling to anything. I felt official. I felt like this is me, like this is where I belong." Darius discusses his work in the subway with professional pride, generally using the first-person plural ("Sometimes we didn't feel that management should be doing certain things ..."). His vision of himself as an NYCTA worker is officious and uncompromising: "I'm a very good train operator. Even though I drive fast, don't get me wrong: I believe in coasting, I don't believe in excessive speeds. Even if you're late don't speed, because eventually you'll catch up. As a conductor, I give a whole announcement before and during stops. . . That's just me. Sometimes they'll make part of an announcement: 'Next stop is Queens Plaza.' Okay, the next stop is Queens Plaza, but what do we *do* there?"

The question of how Darius's immutable sense of belonging has never been damaged by all the skillful impersonation and fakery it depends on is not one that he can answer. I spent almost fifteen hours sitting across a table from him, and I asked this question several times. He looked bemused, his eyes wandered, he half-smiled, he said he just thought of himself as a part of the system, that he felt safer and more content there than anywhere else, that for reasons he doesn't understand this paradox never occurs to him until he is behind bars for a while. He always stressed that he improved service to the "riding customers" and that, given his ability and care, he would never endanger anyone. (During one of these conversations, he said, "Oh—in the article could you put that my title is Transportation Captain? That's the title the employees gave me, because I move around the system so well.")

Eventually Darius began taking the skills tests the NYCTA requires for employment, but by then he was notorious.

✳✳✳

Reclining in the tranquillity of the Fifty-seventh Street tower, Darius heard the descending scale of a train losing its charge. He sat up and waited. He knew something had tripped the train's emergency brake, and he knew the operator would reset the brake and try to recharge the train. When the recharge attempt failed, he picked up his helmet, his vest, his gloves, his lantern, and his flashlight. He was thinking only of the train. The first four cars had made it into the station.

Darius questioned the train operator and lent him his flashlight so that they could begin the routine debris search. Darius was inspecting the tracks when over the train radio he heard Command Center order an evacuation, so he unhooked the chains between the fourth and fifth cars, climbed up and unlocked the two sets of car doors, made the standard evacuation announcement, and continued down the train this way until the last passengers walked off. (After opening each car, he stood by the doors to make sure everyone got through safely.) When the train was empty, he briefly examined its rear brakes and then resumed his debris search. Two transit cops arrived; Darius hurried back to help explain the situation.

The cops, Officers Cullen and Morales, saw passengers exiting the train in a neat stream, and they saw Darius conscientiously inspecting the track with a flashlight. They had just begun questioning the conductor and train operator when Darius rushed up and co-opted an answer: "Yeah, the train went BIE and we think it caught some debris, so we're evaluating the track—the rear brakes checked out, the passengers are all clear." When Darius had gone back to work, the train operator pulled the cops aside and whispered, "This guy's not one of us. He's an impostor."

They found that hard to believe. Everything about Darius—his gear, his carriage, his total comfort with protocol—suggested authenticity. But the train operator had recognized Darius from a Transit Authority wanted poster, and he told the cops to ask for I.D. Darius produced his study-group letter, which essentially convinced them that he was legitimate (they had encountered track-study notices many times before), but the operator was adamant, and they asked Darius to have his supervisor come vouch for him. Darius led Officer Cullen back to the tower, unlocking the door and turning on the lights and telling Officer Cullen to sit down and make himself comfortable. Darius got a drink from a water cooler and sat down at a desk to call a friend. Cullen, short and thick-limbed, with a gelled part in his hair and multiple tattoos and nine years on the force, felt faintly guilty for inconveniencing Darius.

On the phone, Darius asked to speak to someone and then said, "Oh, okay, I'll try back." His boss was out to lunch, he said. Cullen said not to worry, they could wait, and apologized for the annoyance. Out the tower window Darius glimpsed an unfriendly superintendent conferring with the train operator. Darius started laughing. He said, "All right, you got me." Officer Cullen asked him what he was talking about. Darius—now narrowly smiling and incipiently prideful—said, "You got me! I don't work for the TA. The letter's a forgery. I stole the letterhead and did the letter myself. The uniform and keys I got from people I know. I've been doing this for a long time. It's actually easy if you know what you're doing." Officer

The Boy Who Loved Transit : Longreads Blog                                                                12/18/15, 1:51

Cullen stood silent and staring, suspended in his disbelief. "Here's some articles about me," Darius said.

On the way to a formal interview with Assistant District Attorney Michael Dougherty at 100 Centre Street, Darius offered unsolicited, sophisticated descriptions of the NYCTA surface crews the police car passed. Cullen and Morales wondered how he knew so much about the minutiae of surface work; Darius responded with monologues about his mastery of the system. To the officers it seemed that he couldn't speak fast enough, that his confession had energized him and elevated his self-regard. The sight of the Brooklyn Bridge reminded Darius that he had plans to go to a barbecue the next day on the Manhattan Bridge: it was a Friday tradition of a bridge crew he had been working with. He asked if there was a chance he would get out in time. Officer Cullen said that, whether or not he got out, it might not be such a great idea.

At Centre Street, Darius was interviewed by A.D.A. Dougherty and Detective Martin Mullen. He gave no sign that he knew a transgression had occurred, that there was a permanent divide in the room and that he was alone on one side of it. With a single exception, neither interviewer noted any change in his demeanor, which was one of subdued bliss. According to Detective Mullen, "emotionally Darius was even-keeled the entire time. The fact that he was carrying these articles from his previous arrests—it was almost like he dug the publicity, like there was some prestige in the experience."

The exception came when A.D.A. Dougherty suggested that Darius might have had something to do with the train's emergency stop. The absurd, pejorative idea that he would ever com-promise service quality and passenger safety disturbed Darius. "That's exactly what I'm trained not to do," he said. He explained that stopping the train would have required both override per-mission from the City Hall control tower and access to the switch room in the back of the Fifty-seventh Street tower. Neither was available to him—though, as he admitted, he probably could have guessed the location of the switch-room key. City Hall later confirmed Darius's story, and evidence indicated that he had never been in the switch room. His theory of the event—a wheel-detector device had tripped the train's emergency brake because the train had exceeded the posted speed—was later determined to be the most plausible.

Once it became clear that Darius wouldn't plead to the charge of reckless endangerment, Dougherty and Mullen decided to let him talk. He talked for two hours and seemed willing to talk indefinitely. He was cagey when it came to

The Boy Who Loved Transit : Longreads Blog

identifying collaborators or detailing certain methods whose secrecy was essential to his freedom of movement; otherwise, almost any question elicited long tales of his exploits that gave way episodically to ornate, unnecessary digressions. Once I asked Darius what he was doing at Fifty-seventh Street before his arrest. My question implied that he'd been in the station. His answer began like this: "No, no. I was mainly in the tower, not the station. Now. Towers are for what is known as train-traffic control. The board lights tell you where everything is at. All right? Okay. So every single train from Fifth Avenue, on the N and the R, down to Canal Street. Not only that but there's a communications box for listening to the crew on every train. You also have what is known as fire watch. I watch the board for anything relating to a fire condition. Now, if it's something minute, I can hopefully go down and end the problem without having to call the fire department. If it's close to the third rail, use a dry chemical. If it's something major, call the fire department, call Command, have the power turned off for that section because otherwise the fire department cannot go on the tracks, that's part of their protocol. . . . And if need be you can have EMS on standby, just in case. So you always take all necessary precautions. Okay! Now on this particular day, I'm in the tower..."





Photo via James Lee (Cropped)

Darius's obsession has always been concentrated on the subway, but a long

interview with him will teach you how far beyond it he has roamed. He may describe his experiences as a substitute engineer on the freight trains of Conrail, Norfolk Southern, Delaware & Hudson, or CSX. ("CSX is definitely my favorite. Every single engine is freshly painted.") He may tell you how to manipulate the employee-transfer protocol of the metro bus system to get a job as a shifter (cleaning and prepping buses at depots), and how to use that position to take buses out on express routes. He might explain Job 179 (conductor) on the Long Island Railroad: what track you'll be on (17 or 19), how to let the crew know when you've finished preparing the train for departure (two buzzes on the intercom), how you return to Penn Station "as equipment" (without passengers). It is unlikely that Darius will omit the year he spent wearing an NYCTA superintendent's shield. While he was doing a stint as a conductor, he discovered that he could have a shield made in a jewelry store. He began wearing it on a vest he pulled over his TA-specified shirt and tie. He had a hard hat and pirated I.D. Darius considered himself a track-department superintendent, so he signed out track-department vehicles and radios and drove around the city, supervising track maintenance and construction projects and responding to emergencies. He was sensitive to the threat of close scrutiny by superiors, but given his high position and network of allies, that was rare. Darius worked regular hours: eight to four from Tuesday to Thursday, seven in the evening to three in the morning on Friday, and three until eleven on Saturday morning. That way he was off from Saturday morning until Tuesday morning. "Because of my title and my position," Darius told me, "I figured I had the seniority to do it."

At the end of the Centre Street interview, Darius was facing felony charges to which he had confessed. He had twice been convicted of felonies. He had just dramatically violated his parole, and he had multiple parole and probation violations on his record. But he never asked Detective Mullen or A.D.A. Dougherty about his legal situation. He shook their hands and was led out in handcuffs, his still face showing contentment.

**\***

On that day Darius's parents, who had retired from New York to North Carolina, awaited him uncertainly in their house outside Winston-Salem. Since his release, Mr. and Mrs. McCollum had prevailed on him to apply for a parole transfer and recommence his life in North Carolina, where Mrs. McCollum's nephew had found him a job through a state program for parolees. Darius stayed with them for a few weeks, and then went up to New York for a parole hearing. But weeks had passed; Darius's aunt, with whom he'd been staying, no longer knew where he was or what

What he was doing, while sleeping and eating and showering at Nelly's or in NYCTA crew rooms, was driving a de-icer train from Coney Island to Prospect Park on the D line; putting out track fires (a train dripping battery acid caused a small explosion at Thirty-fourth Street and Sixth Avenue, a tossed cigarette butt kindled a small rubbish fire in Brooklyn); investigating a busted water main at 110th Street on the A line; flagging traffic, on weekends, around a transit construction project at Queens Plaza ("The guys from transit that do street flagging, they look as if they're stiff, and see, when I do it, I look like I'm with DOT, because I make it look so efficient-I know how to do the hand signs"); assisting the track crew he mentioned to Cullen and Morales with inspections of the Manhattan Bridge on Mondays, Wednesdays, and Fridays; and entirely repainting a crew room after hearing a supervisor say that it would make a good project for someone. This all happened, Darius says, because he ran into some old friends at Queens Plaza soon after he got back to New York, and they invited him to hang out and take some of their shifts, and he thought he could do a few and go back to North Carolina, "but it just kept going, and that was it."

## Darius's call from Rikers Island didn't surprise Mr. and Mrs. McCollum.

Elizabeth McCollum is unreserved and accurately judgmental and dresses well and cannot discuss her son without becoming fervent; she retired a decade ago from an administrative job at a textbook company. Samuel McCollum, a former plant supervisor, is bulky and skeptical, has an impulsive falsetto giggle, and tries, when discussing the actions of others, to discover decent motivations that have been obscured by mistakes or cruelties. Like his wife, he has been injured by the experiences of his only child: "Darius won't open up and talk about anything. He would never elaborate on an answer. That's all we ever wanted. Now, how do you get somebody like that in touch with himself?" On the day of the final arrest, Mrs. McCollum was still hopeful: "You can't let negativism cloud you, because with Darius, once that comes in, forget it." She and Mr. McCollum talked about the life Darius might have in North Carolina, and thought about getting him a driver's license and a pickup truck, which he had always wanted. They didn't say it, but they were each thinking that in their house Darius grew restless immediately.

The McCollum house stands at the edge of a rural two-lane, on a four-acre grass lot that runs to a curtain of hard-woods. The neighboring houses, similarly

Case 2:16-cv-05272-LDH-VMS   Document 6   Filed 10/07/16   Page 24 of 36 PageID #: 72  12/18/15, 1:5
The Boy Who Loved Transit : Longreads Blog
Case 2:16-cv-05272-JFB-ARL   Document 1   Filed 09/15/16   Page 28 of 40 PageID #: 28

situated, occasionally give way to grazing horses. When I visited, the only thing in one big field down the road was a tethered mule. The problem for Darius was that he couldn't walk out the front door and easily go anywhere. The McCollums had furnished their house ardently: chiming clocks and porcelain figurines and hand-stitched antimacassars and graven glassware and pictures of sunset-silhouetted African kings left no blank space. Emptied from many rooms in many homes over a lifetime and now tensely converged in this final house, these encroaching objects in their familiarity had become largely invisible to Mr. and Mrs. McCollum, but in an attempt to understand the propensities of her son, Mrs. McCollum had preserved every document—subway notes and journals, school reports, letters from prison—that might explain him, and this expanding collection never entirely disappeared from her or her husband's awareness. Much was boxed; much lay around, visible and frequently handled; the things that Mrs. McCollum liked to look at every few days remained enshrined in convenient places. One was a letter from prison, dated June 12, 1987:

> Its me again saying hello along with a thought ... my thought goes like this. There once lived a young man and a very bright man. This young man had ... such good parents ... they did everything that they saw was good for this guy. . . The guy was actually great until he [got] into his teenage years and started hanging out around trains, trucks and buses, but one day it all caught up with him and this young man was confused. . . This guy is away somewhere to where he can't runaway from and has to face his problems. He is sorry for everything and wants. to forget about everything he has done. That is the end of that story. This is a beginning step. I am wondering what is going to happen when this young man comes home. .. I'm sure there will be some changes but what I mean is will he be able to find his destiny.

Darius's call from Rikers Island didn't surprise Mr. and Mrs. McCollum. They had long since learned how to entertain ambitious plans for him while anticipating legal dilemmas. They replaced his court-appointed attorney with a family friend named Tracey Bloodsaw. Bloodsaw decided on a psychiatric defense and got the access order required for an examination, but corrections officers at Rikers Island, on various bureaucratic pretexts and over a period of months, refused to admit her psychiatrist. Justice Carol Berkman declined to intervene on the psychiatrist's behalf, and eventually precluded a psychiatric defense, declaring that adequate notice of such a defense had become impossible. Bloodsaw told Berkman what she thought of the ruling, explained to the McCollums that she had become a liability to Darius, and removed herself from the case.

Darius's next lawyer, Stephen Jackson, accepted a plea, and Justice Berkman
scheduled a sentencing hearing. This empowered her to order—as opposed to
merely authorizing—a psychiatric examination. A prison psychiatrist, after a
cursory evaluation, noted that a neurological disorder called Asperger's Syndrome
might explain Darius's behavior. Almost simultaneously, Jackson was contacted by
members of several Asperger's support groups. Darius, whose arrests had been
covered in newspapers for twenty years, had become well known among
Asperger's experts and activists, and his case had been cited in at least one scholarly
work. There was a strong consensus in the Asperger's community that Darius
suffered from the syndrome, and dismay that his treatment had consisted entirely
of jail time. Jackson decided to request an adjournment in court so that Darius
could be examined and might receive a counseling-based sentence.

***

Stooped and silent at his sentencing, in late March of last year, Darius stood at the
very edge of the courtroom, just in front of the holding-cell door through which he
had been led. In accordance with the law, he faced Justice Berkman, who sat on a
high plinth before a ten-foot mural of the Lady of Justice, between half-furled flags
on eagle-tipped poles. The justice had black-gray hair and a squinty, repudiative
face. She often listened to the lawyers with her chin on her upturned palms and her
incredulous mouth open; she often rolled her eyes with unusual vigor and range,
her head following, as if drawn by her eyes, until it almost touched her shoulder.
Darius looked around only once, for his mother. Mrs. McCollum, anxious and
carrying an accumulation of anger at the legal system, forced herself to smile at
him. Darius says he wasn't thinking about anything: he knew what was going to
happen.

I arrived before Darius and watched a few brusque bail hearings. The distant
ceiling diminished the few spectators. Then the clerk called Darius's docket
number and the lawyers identified themselves. They had spare tables at the foot of
Justice Berkman's plinth. A.D.A. Dougherty—plain, young, resolute—sat alone.
Stephen Jackson sat with Alvin Schlesinger, a former colleague of Justice
Berkman's who had been recruited by the president of an Asperger's organization.
Jackson is tall; every aspect of his appearance had been managed. His manner was
measured and grandiloquent: he seemed to take a special pleasure in formality.
(When I called him afterward and asked for an interview, he said, "Certainly I
would be amenable at some point in time. Would you like to do it telephonically?")
Schlesinger, who had retired to the country, seemed patient in a practiced, almost
impervious way; after the sentencing he would drive back to Vermont without

stopping, drink a double scotch, and write Justice Berkman a letter he would never send.

## "This man is a danger.... But in the meantime we've made him a poster boy for the system's lack of compassion for the mentally ill."

Jackson rose. "Your Honor," he said, "after the Court agreed to provide a plea to satisfy the indictment, I was inundated with information regarding Darius's possible psychological condition. It is apparent that he may be afflicted with Asperger's Syndrome. . . The Court is aware of the letters that were sent to the Court providing the Court with information regarding the disease, and—"

"I'm sorry, Mr. Jackson," Justice Berkman said, staring hard at various faces in the courtroom, "but perhaps we could bottom-line this ... having educated myself on the website and with the DSM and so forth, Mr. McCollum has some characteristics which are very much inconsistent with Asperger's. He's got a lot of friends. You told me he has a fiancée, and one of the major signs ... is social dysfunction. Not just, gee, his friends think he's a little strange sometimes but an inability to relate to others. ..." Mrs. McCollum started to get up and was pulled back down by the people on either side of her.

"In any event," Berkman said, "I don't understand what the point is. ...So far as I can tell there's no treatment for Asperger's. That is number one.... Number two, Asperger's would not disable him from knowing that he's not supposed to form credentials identifying him as an employee of the Transit Authority and go in and take trains or buses or vans or cars or other modes of transportation, which I gather has been his specialty....I don't see any reason to delay this further, because for some reason the press thinks that, oh, Darius is not responsible. Darius is responsible. ... He can stop doing this, if his family and friends would stop telling him, oh, isn't this amusing. Right?" Mrs. McCollum rose rapidly and was pulled down.

Mr. Schlesinger stood and requested an adjournment so that the defense could have Darius examined and explore treatment options. Many experts felt that Darius had the disorder and to deny treatment was to risk indefinitely perpetuating his past: a limbo in the alternating forms of furtive impersonation and incarceration. Schlesinger had secured a promise from an Asperger's expert at the Yale Child Study Center to examine Darius and recommend a residential treatment

The Boy Who Loved Transit : Longreads Blog                                                                    12/10/15, 1:56

Case 2:16-cv-05272-LDH-VMS   Document 6   Filed 10/07/16   Page 27 of 36 PageID #: 75
Case 2:16-cv-05272-JFB-ARL   Document 1   Filed 09/15/16   Page 31 of 40 PageID #: 31

facility. A.D.A. Dougherty stood and opposed the request. Given his history of
parole and probation violations, Darius was a bad candidate for any treatment
program. Stephen Jackson stood and pointed out the circularity: Darius is not a
good candidate for treatment because of his condition, and his condition persists
because he's not a good candidate for treatment.

Resisting several defense attempts to respond, Justice Berkman stabbed out: "Well,
now that I've been accused of presiding over a travesty of justice and condemning
Darius to a life sentence, I suppose there is no way of the Court coming out of this
looking anything but monstrous.... This man is a danger.... But in the meantime
we've made him a poster boy for the system's lack of compassion for the mentally
ill. Well, I have a lot of compassion for the mentally ill. You know, we don't lock
them up anymore. We let them have lives, and most of the mentally ill, I hear from
the experts . . . lead law-abiding lives. Darius McCollum does not. That's too bad.
The law says he has to face the consequences of that, because ...he has free will, and
that's the nature of humanity, and unless he wants to be treated like an animal ... he
has to exert his free will for the good ... and to say that he is incapable of doing that
is to take away his humanity. So all those people out there making faces at me"—
Mrs. McCollum was shaking her, head exaggeratedly—"thinking of me as the
Wicked Witch of the West, are, in fact, the people who are stealing his humanity
from him...."

Mrs. McCollum stood up; before she could be pulled down Berkman had
sentenced Darius to five years in prison. When the gavel hit, all the released talk
overwhelmed her rapid words.

Jackson immediately appealed, on the ground that Justice Berkman's failure to
grant an adjournment at sentencing was arbitrary. It's a weak argument: Jackson
agreed to a plea and sentencing date and then waited until sentencing to ask for
more time; Justice Berkman made no technical mistakes. The D.A.'s office has been
disinclined to consider vacating Darius's plea and changing his sentence if he is
diagnosed with Asperger's. This option, proposed by Alvin Schlesinger, who as a
Supreme Court justice developed a relationship with New York County District
Attorney Robert Morgenthau, was theoretically available to the defense as soon as
Darius was sentenced. Jackson, inexplicably, has yet to have Darius examined.

***

Asperger's Syndrome, which mainly affects males, is generally considered to be a
mild variant of autism, with a prevalence rate several times higher. The *Diagnostic
and Statistical Manual of Mental Disorders* requires five symptoms for a diagnosis:

"impairment in social interaction," including "failure to develop [appropriate] peer relationships" and a "lack of social or emotional reciprocity"; "restricted, repetitive and stereotyped patterns of behavior, interests and activities," including an "encompassing preoccupation with [an area of] interest that is abnormal either in intensity or focus"; "significant impairment in social, occupational or other important areas of functioning"; and "no significant delay in cognitive [4] or language [5] development."

Among the "encompassing preoccupations" in the literature of Asperger's: Abbott and Costello, astro-physics, deep-ocean biology, deep-fat fryers, telephone-wire insulators, carnivorous dinosaurs, cows, Wagner, nineteenth-century Russian novels, storm drains, steam trains, transit timetables, Zoroastrianism, Zsa Zsa Gabor, and the genealogy of royalty. Entire lives are brought to bear on one tiny piece of the world. Because abstract thought tends to be very difficult for people with Asperger's, they satisfy their obsessions by amassing precisely defined units of information: numbers, terms, codes, dates, titles, materials, names, formulas.

Asperger's precludes normal emotional intuition. Behavioral cues are elusive: winks and shoulder-shrugging and sarcasm are often meaningless. Conversations are one-sided; patients generally deliver long, fact-crowded monologues on their areas of expertise, blind to gestures of boredom or puzzlement. General questions, which can require both speculating abstractly and intuiting a questioner's intent, are often impossible for people with Asperger's to answer. Patients may respond with a far-reaching elaboration of a single related fact or experience.

Conventions of interpersonal behavior, if they are not explicit, remain beyond comprehension, as when a small boy, generally affectionate toward his mother, asks her why, given that he can dress and feed himself, she is still necessary, or when a boy endlessly photographs people while telling them that humans are his favorite animal, or when Darius writes to his parents from prison: "Hello There, People of America lets get down and party on as we say hello and what's going on, cause I know there's something going on ..." and:

Case 2:16-cv-05272-LDH-VMS  Document 6  Filed 10/07/16  Page 29 of 36 PageID #: 77  12/19/15, 1:5
The Boy Who Loved Transit : Longreads Blog
Case 2:16-cv-05272-JFB-ARL  Document 1  Filed 09/15/16  Page 33 of 40 PageID #: 33

*I am enclosing a reese's peanut butter cup coupon to let you read and see if you can win some money. Just read the directions.... I kind of wish that I was a Jeanie so I wouldn't have to be here'. "Ha-ha." I've got a stiff neck and itching all over and cold feet and runny nose and watery eyes itchy ears o Mom I'm just in poor shape. There's a rat under my bed and a little green man on my head but there's a true blue inside of you that keeps stopping me to say that I Love You. In here: It's like Death of a Salesman with a happy ending I hope. Well you guys I guess I will go to bed to get warm so have fun and keep out of trouble. Give my regards to Broadway ...*

Explicit rules that make sense socially but aren't strictly rational seem unconvincing and often go unheeded, as when a boy in junior high asks a female classmate if he can touch her crotch as casually as if he were asking to borrow an eraser. That explicit and logical rules exist along a continuum of seriousness is unappreciated, as when a young man follows a barefoot woman around a supermarket, assiduously trying to conceal her naked feet from employees, and then stands behind her in the express lane, diligently removing one of her purchases each time she turns her head until she is no longer over the ten-item limit.

Speech is oddly formal and often unmarked by accent, as if verbal local color had been filtered out. Specialized phrases are applied in a way that is logical but, from the perspective of conventional usage, awkward or bizarre, as when an English boy describes a hole in his sock as "a temporary loss of knitting."

For people with Asperger's, self-identity has little to do with internal life; information constitutes identity. One boy who was asked to draw a self-portrait sketched an ocean liner, cracked and sinking beside an iceberg; the Titanic was his obsession. Another self-portrait accurately represented a tsunami-shadowed tract of California coast; its author was fascinated by plate tectonics. An autobiographical statement:

*I am an intelligent, unsociable, but adaptable person. I would like to dispel any untrue rumors about me. I am not edible. I cannot fly. I cannot use telekinesis. My brain is not large enough to destroy the entire world when unfolded. I did not teach my long-haired guinea pig Chronos to eat everything in sight (that is the nature of the long-haired guinea pig).*

People with Asperger's recognize their difference. One patient said he wished he had a micro-brain on his head to process all the intuitive meaning that surrounded

and evaded him. Another patient, studying astronomy, told his therapist that he knew how scientists discovered the stars, and what instruments they used to discover the stars, but not how they discovered the names of the stars. He said he felt like a poor computer simulation of a human being, and he invented algebraic formulas to predict human emotion: frustration (z), talent (x), and lack of opportunity (y) give the equation $x + y = z$.

Darius, explaining that he has never needed to socialize and really only associates with people in transit systems, said to me, "Some people think that I'm different. Okay, fine, I am different, but everybody's different in their own kind of way. Some people just don't know how to directly really react to that." Before Darius's sentencing hearing, Stephen Jackson sent him a pamphlet on Asperger's. It was the first Darius had heard of the disorder. When I asked him about the pamphlet, he said, "I'll put it like this. Out of the twelve things that's on it I think I can identify myself with at least eight or nine. And all you need is five to have, you know, that type of thing."

Asperger's patients choose obsessions the way other people choose interests: personality accounts for the choice. Sometimes, usually when they're young, patients acquire and discard fixations in swift succession, but eventually a single subject consumes them. They are born to fall down some rabbit hole, from which they never fully emerge.

***

The Clinton Correctional Facility, where I interviewed Darius, is a leviathan relic from 1845, just south of the Canadian border, with granite walls thirty feet high. In the intake center a guard examined the cassette and batteries in my tape recorder. I was escorted across a lawn to the main prison building. The walls leaned in—thirty feet is claustrophobically high. There were long-barreled guns and searchlights in guard towers. I felt as if I might provoke a terrible reaction by accident. We went through the prison lobby, a leaden door, a corridor, another leaden door, and arrived at the interview room, where the guard left me. Except for a table and chairs, the room was as plain as a cell. I sat waiting in a restless institutional quiet. Two guards brought Darius in. In his jumpsuit he looked lumpy and quiescent. We shook hands—Darius's handshake was bonelessly indifferent—and sat down. The guards left, one whispering to the other, "He's pretty docile."

I made a vague little speech: I was writing an article, etc. Darius nodded politely as I talked but gave no indication that he was interested in my aims or motivations or life. When I finished he asked where I was staying and how much it cost and what

train I'd come on and how long it had taken. From the time of the trip he guessed that my train hadn't had an M-10 engine; he wished me luck getting one on the way back. I started asking about his career in transit, and he showed the transporting animation that Detective Mullen had observed. He sketched control panels in the air, he drove trains in mime, he asked for paper and drew the track intersections of subway stations. He often looked away to concentrate on the images he conjured.

Clinton is a maximum-security facility. Darius was there because the Department of Corrections, aware of his impersonation convictions, considered him an escape risk. To keep him safe the DOC had to segregate him from the general population, which meant confining him to his cell for, Darius said, twenty-one hours a day. That morning he had made the guards laugh by wedging a sign in his cell bars that said, "Train Out of Service." He watched TV and read general-interest magazines; he studied arrangements of facts in several specialty publications he subscribed to: *Truckers News, World of Trains, Truck 'N Trailer*; he made lists of various things, like 185 love songs he happened to think of one day; and he wrote a lot of letters requesting information. Unsatisfied by something he saw on TV, he wrote to the Department of Defense, which replied:

> Unfortunately, the term "discretionary warfare" is not currently used by the Department of Defense (DoD), so I am uncertain what you mean by it. In addition, there are no 12-man Special Operations units made up of personnel who are at the rank of Colonel or above. There are, however, Special Operations units made up of 12 men: the US Army Special Forces A Teams. The Special Forces A team is made up of two officers, two operations/intelligence sergeants, two weapons sergeants, two communications sergeants, two medics and two engineers—all trained in unconventional warfare and cross-trained in each other's specialties.

Darius underlined the word "two" every time it appeared.

On May 31 of this year, Darius will have spent 799 days in prison. At his first parole hearing, 912 days into his sentence, the D.A.'s office will present his history of violations. His full sentence comes to 1,825 days. In the interview room of the Clinton Correctional Facility, I asked Darius if he thought he would continue to impersonate transit employees and otherwise break the law. He looked at the ceiling and took a long breath. He seemed to have prepared his answer. "Okay," he said, "trains are always going to be my greatest love. It's something that I depend upon because I've been knowing how to do it for twenty-five years. So this is like my home, my best friend, my everything. Everything that I need and want is there.

But I don't want to get caught up with that again, and I'm probably going to need a little help. That much I can admit. If I can find—I know there's no such program as Trains Anonymous, but if I can get some kind of counseling it would be really beneficial towards me."

Darius doesn't like prison and complains about its deprivations, but he never expresses despair or outrage at the severity of his punishment. He sees his experience in terms of its daily components, without considering the entirety of his sentence—the abstract unbroken length of time between the present and his release. "I'll get out of here sooner or later," he says. And it doesn't occur to him to imagine an alternative life for himself: he never wonders what he might have been.

\*\*\*

Posted by Julia Wick on May 5, 2015



Categories: Nonfiction, Story
Tags: Asperger's Syndrome, autism, harper's, Jeff Tietz, nonfiction, reprint, story, subways, transit

## Get the Longreads Weekly Email

Sign up to get the week's best Longreads delivered to your inbox every Friday afternoon.

| Email address | Subscribe |

## Donate to Writers, Get a Tote

We've published more than 100 exclusive stories, all funded by you. Contribute $50 a year or more and you'll get a special Longreads tote bag.

*Become a Member*

EXHIBIT "B"

Japeth Baker
Manhattan Legal Aid
Reference:
Darius McCollum
212 349-8610

December 20, 2006

Dear Sir,

I am an investigator with the NY State Police, assigned to the FBI Joint Terrorist Task Force in New York City. In the course of my duties, I have become acquainted with Darius McCollum, both during and subsequent to his recent incarceration in the New York State Corrections System. Because of the nature of his mental illness, Darius feels compelled to engage in the unauthorized access to transportation facilities, and the unauthorized operation of both public and private mass transit equipment, behavior which has resulted in criminal charges and penalties. Because of his skill in penetrating security, Darius has been approached on numerous occasions by persons wishing to exploit his talent, for the purposes of far more nefarious activities than a mere joy ride. For this reason, Darius has been interviewed and debriefed by myself and other members of the law enforcement community. Darius has been extremely forthcoming and informative, and has contributed to improvements in the security of our mass transit system. Because of his cooperation with law enforcement officials, and the security risk that he poses to ................., it is possible that Darius may be harmed or exploited by other inmates, and thus it is my strong recommendation that Darius be segregated from the general population of any detention facility he may be incarcerated in.

It is unfortunate that Darius's mental condition causes him to engage in criminal behavior, for which the penalty has been incarceration in prison. Although I do not have the requisite credentials or expertise to diagnose mental illness, I feel compelled to state that I believe Darius is not ............................ to fully understand the impact of his compulsion, and that .................................................... for him. I honestly believe Darius would not ........................... in another prison, and hope that there is some mental health program ............................ he sentenced or committed to. I would gladly testify on his behalf at any trial or proceeding, and can be reached at the following contacts.

Respectfully,

INV. Jeremy Marcwell
New York State Police
FBI NY QI-2
26 Federal Plaza
New York, NY 10278
646 696-2838
646 773-8425

EXHIBIT "C"



**DIVISION OF HEALTH CARE ACCESS AND IMPROVEMENT**
**CORRECTIONAL HEALTH SERVICES**

## AFTER CARE LETTER

Date: 2/19/2016

To Whom It May Concern:

Patient: **McCollum, Darius (1411510921)** has been under our care for the following conditions:

### I.  Health Problems (Mental Health Only)

The above patient is currently in treatment for the following conditions:

Axis I:

- **Depressive Disorder, unspecified (296.00)**
- **Obsessive- Compulsive Disorder (300.3)**

Axis II:

- **Asperger's Disorder (299.80)**

### II.  Treatments; Medications; Date; Follow-up Needs

- **Remeron 15 MG**
- **BusPIRone 5 MG**

Patient is designated SMI-YES (Seriously Mentally Ill); Mr. McCollum participates in mental health treatment and would benefit from continued mental health and psychiatric intervention to maintain management of psychiatric symptoms.

**Follow-up care is required for the above condition(s)**

Serena Thompson, Ph.D.

Clinic Tel # 347. 774. 7000